# In re Estate of John Farson, Deceased.

## On Appeal of Mamie A. Farson, Executrix, Appellant, v. Gustavus A. Buder, Appellee.

### Gen. No. 19,349.

1. SALES, § 374*—*when instruction defining market value of stock misleading.* An instruction telling the jury that the market value of shares of stock "is the price at which such stock may be purchased by a purchaser using due diligence * * * at the time when such purchase is made for the current price," *held* misleading in view of the admission of incompetent testimony of witnesses that in their opinion an attempt to buy or sell a block of such shares at one time would probably cause the market price to rise or fall.

2. SALES, § 376*—*market value defined.* The market value of property is the price which it will bring in the market on a fair sale when the seller is willing but not obliged to sell, and the buyer is willing but not obliged to buy.

3. SALES, § 374*—*when instruction on measure of damages for nondelivery of stock erroneous.* In an action for the breach of a contract to deliver shares of stock, an instruction telling the jury that the measure of damages is the difference between the contract price and the market price at the time of the seller's failure to deliver, or within a reasonable time thereafter, *held* erroneous in so far as it used the phrase "or within a reasonable time thereafter."

*See **Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly,** same topic and section number.

4. SALES, § 372*—*where opinion evidence incompetent.* In an action for breach of a contract to deliver shares of stock, testimony of witnesses that in their opinion an attempt to purchase or sell a block of 485 of such shares at one time would probably cause the market price to rise or fall "50 to 100 points," *held* incompetent.

5. SALES, § 376*—*measure of damages for refusal to deliver shares of stock.* On a breach of a contract to deliver personal property, the measure of damages is the difference, if any, between the contract price and the market value thereof at the time and place when and where they should have been delivered, together with interest upon such difference from the time of the breach to the time of the trial; and such rule applies where the subject-matter of the contract is shares of stock.

6. SALES, § 372*—*evidence competent to prove market value.* In an action for refusal to deliver stock under a contract of sale, evidence of actual sales at the time of the breach is the best evidence of the market value at the time; but in the absence of such sales, evidence of other sales within a reasonable time before or after the breach is competent as tending to prove what the fair market value was on the day of the breach.

Appeal from the Circuit Court of Cook county; the Hon. H. STERLING POMEROY, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1913. Reversed and remanded. Opinion filed June 15, 1914.

WINSTON, PAYNE, STRAWN & SHAW, for appellant; JOHN D. BLACK and GARRARD B. WINSTON, of counsel.

ALBERT H. MEADS, for appellee.

MR. PRESIDING JUSTICE FITCH delivered the opinion of the court.

Appellee filed a claim in the Probate Court for $33,950 against the estate of John Farson, deceased, for "the amount due by reason of breach of contract" for the sale of 485 shares of the capital stock of the Burroughs Adding Machine Company, a corporation having its principal place of business in Detroit, Michigan. The Probate Court allowed the claim to the extent of $16,975. Upon appeal to the Circuit Court, there were two jury trials. The first resulted in a dis-

---

*See **Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly,** same topic and section number.

agreement and the second in a verdict in favor of ap-
pellee for $13,095. From a judgment entered on that
verdict, the executrix has prosecuted this appeal.

It appears from the evidence that on June 7, 1909,
Farson, Son & Co., of which firm John Farson was a
member, made a bid of $163 a share for the stock in
question, which was then owned by Helen Burroughs
White, a minor residing in Seattle. Their bid was ac-
cepted by the guardian of the minor, subject to the
approval of the Superior Court of Kings county,
Washington. Apparently the court's approval was
never obtained, for the sale was never completed. On
the same day the bid was made, Farson, Son & Co.,
through a stockbroker in Chicago, named Sardy, of-
fered the stock for sale to divers parties and received
a bid of $165 per share from Buder & Buder, of St.
Louis, Missouri, who (or one of whom, at least) had
some interest in the Burroughs Company. The next
day, Sardy had a telephone conversation with them,
resulting in his accepting their bid, whereupon he
wired his acceptance as follows: "I sell you four
hundred eighty-five shares Burroughs Adding Ma-
chine at one hundred sixty-five net to you." To this,
G. A. Buder replied, on the same day: "Attach proxy
for stockholders' meeting Thursday to stock and
draft." Sardy communicated these facts by telephone
to Farson, Son & Co., and at the same time wrote
them: "Confirming conversation with you over the
telephone, I have sold for your account to Buder &
Buder, Granite Bldg., St. Louis, Mo., 485 shares
Burroughs Adding Machine Stock at 165 net to the
buyer, less ¼ point commission to me. Kindly ship
the stock direct to Buder & . ¹er." Farson, Son &
Co. replied by mail: "W            sed to confirm sale
to you of 485 shares Burro         · Machine Stock,
Price 165 net to buyer, less        n to you. We
have noted your instruction.        o shipment."
The next day, Buder & Bude         Sardy saying
they had received information       )ck belonged

to a minor and that the guardian had no authority to sell it, and requesting Sardy to "Please let us have your authority and the authority of your client for making sale," adding that "in the meantime, we have instructed the Mercantile Trust Company not to pay draft with stock attached." Sardy showed this letter to John Farson, who took a copy of it, said the stock was sold, that he expected "to make a good delivery," and that the buyer would have to take it. No delivery was made, however, presumably because Farson, Son & Co. did not have the stock to deliver and were unable to furnish proof of authority to sell the same. On July 2, 1909, G. A. Buder wrote to Sardy claiming the right to receive a dividend of two per cent., payable on June 30, 1909, on the shares "bought by me from you." Sardy sent this letter to Farson, Son & Co., who replied: "You advised us some time ago that your party refused delivery. With our best respects, we are," etc. To this Sardy rejoined that he had not so advised them, but had merely submitted a letter from the buyer asking for their authority to make the sale. On July 29, 1909, Sardy saw John Farson in person and told him that "his customer demanded a delivery of the stock." Farson replied that the buyer had said "he didn't want the stock," and refused to further discuss the matter.

On November 18, 1909, another guardian was appointed for the minor's estate. Within sixty days after his appointment, he sold the stock, through brokers in New York City, at the price of $190 a share for 25 shares, and $192 a share for the remainder. It was shown that the Burroughs Company's stock was not listed on any regular stock exchange, that it was "closely held," that but few sales had been made in the open market and that its "book value" was about $162 a share. The following actual sales were shown, however, in addition to the sale to Farson, Son & Co. and the sale by them to appellee, viz.: in August, 1909, 3⅓ shares at $170 a share and 15 shares

at $175; in September, 40 shares at $184; and in November, 52 shares at $183.33.

The trial court instructed the jury, at the request of appellee, that if they found the issues for the plaintiff, the measure of damages was the difference between the contract price and the market price "at the time of the decedent's failure to deliver such stock, *or within a reasonable time thereafter;*" and that the market value of stock is "the price at which such stock may be purchased by a purchaser using due diligence under all the conditions to secure such stock *at the time when such purchase is made* for the current price." As tending to prove the market value of the stock in question, as thus defined, appellee was permitted to prove by several witnesses that, in their opinion, an attempt to purchase or sell a block of 485 of such shares at one time would probably cause the market price to rise or fall "50 to 100 points." This evidence was clearly incompetent. The probable effect of such a supposed transaction was pure speculation. The witnesses who so testified clearly indicate by their answers that their opinions were mere conjectures as to what might happen in such a case. Such conjectures cannot be received as any evidence whatever tending to prove the value of the stock in question at any time. With this evidence before the jury, admitted, as it was, with the apparent sanction of the court, the instructions mentioned were very misleading. The jury may well have understood therefrom that if there was a breach of the contract, appellee was entitled under the evidence to recover, as damages, the difference between the contract price of the stock and the price which appellee might possibly have had to pay for it if he had been compelled to buy it all once at any price the holder of so large a "block" might choose to exact under such circumstances. It has repeatedly been held that the price paid at a forced or involuntary sale is not a fair criterion of market value. The market value of property is the price which it will

bring in the market on a fair sale when the seller is willing but not obliged to sell, and the buyer is willing but not obliged to buy. *Brown v. Calumet River Ry. Co.*, 125 Ill. 600; *Lanquist v. City of Chicago*, 200 Ill. 69. While this definition, or its equivalent, is most frequently found in condemnation suits, where the market value of real estate is in question, yet the same rule was applied to the value of stocks in *Walker v. People*, 192 Ill. 106. In that case, the question arose as to the correct rule to apply in fixing the fair cash market value of stocks for appraisement under the Inheritance Tax Law. The Court there said: ''As we understand the position of counsel for appellants, it is that the market price of these stocks should have been fixed at the market price as it would be on a certain day, in case the entire holdings were forced upon the market, and a forced sale of the same was made without regard to the actual value of the stock per share, or the ordinary method of doing business in reference to handling, purchasing or selling the same. We are unable to concur in the correctness of this view. * * * Fair market value, as applied to this case, is not what the stocks would bring at a forced sale, but what they would bring at a sale after due notice of the facts, and under fair conditions in the ordinary course of business. * * * The very fact, that the market would be depressed by forcing large blocks of stock upon it, and forcing such large blocks of stock to sale, indicates that such a sale is not a proper test of the fair cash value of the stock.''

Aside, however, from the misleading character of the instructions mentioned, we are of the opinion that the phrase ''or within a reasonable time thereafter,'' as used in the instructions, is an erroneous statement of the rule as to the measure of damages applicable to the facts in this case. That this clause was not used inadvisedly by the trial court is shown by the fact that the court modified one of appellant's instructions on the same point by inserting that clause. The cor-

rect rule, as recognized in the courts of this State, is that on a breach of contract in failing to deliver articles of personal property, the measure of damages is the difference, if any, between the contract price of such articles and the market value thereof at the time and place when and where they should have been delivered. (*Sleuter v. Wallbaum*, 45 Ill. 43; *Capen v. Du Steiger Glass Co.*, 105 Ill. 185; *Smith v. Dunlap*, 12 Ill. 184), together with interest upon such difference from the time of the breach to the time of the trial. *Driggers v. Bell*, 94 Ill. 223; *Plumb v. Campbell*, 129 Ill. 101. The mere fact that the subject-matter of the contract is stocks furnishes no exception to this rule. *Sturges v. Keith*, 57 Ill. 451. In *Sleuter v. Wallbaum*, *supra*, which was an action of *assumpsit* brought to recover damages for breach of a contract to deliver one million bricks, the trial court gave an instruction stating that if the jury find for the plaintiff, "the damages will be the difference between the contract price and the increased market price when the defendants refused to deliver them and when the plaintiff requested them, *or within a reasonable time thereafter for procuring such a quantity;* and, in finding what is a reasonable time, the jury may consider the state of the market, as to scarcity of brick, or otherwise, and may take also into consideration the quantity required to be purchased to fill the contract." The Supreme Court held that the latter part of this instruction was erroneous and reversed the judgment for that reason, saying (p. 46): "This instruction gave the jury too great a latitude in ascertaining the amount of damages. By it, they were authorized to consider the price of brick for a reasonable time after a breach, to enable appellee to procure them, and to consider the state of the market, the scarcity of brick, and the quantity to be purchased. The question of how long would be reasonable, was at least very indefinite. It might be one month, six months, or even a year, for aught we can

know.  Under it the jury are authorized, at any rate for a considerable period after the breach, to select the highest market price as the measure.   *   *   * The only safe rule is to confine the measure of damages to the market price *at the time of the breach.*" The remarks of Mr. Justice McAllister in *Sturges v. Keith, supra,* at pages 462, 463 of the opinion, are also in line with this reasoning and tend to the same conclusion.

We do not mean to intimate that the evidence which was offered as to actual sales of the stock in question, at *or about* the time of the alleged breach of the contract, was not admissible.  Evidence of actual sales at the time of the breach is the best evidence of the market value at that time.  But in the absence of such sales, evidence of other sales, within a reasonable time before and after the breach, is competent as tending to prove what the fair market value was *on the day the breach occurred.*  Such evidence is sometimes the only evidence available, and therefore the best evidence of which the nature of the case is susceptible.  It was upon this theory that in a recent decision of the Supreme Court even bona fide offers were held to be competent evidence of the market value of real estate, where there have been no actual sales.  *City of Chicago v. Lehmann,* 262 Ill. 468.

It is also suggested that there is no evidence of any breach of contract on the part of Farson, and that the evidence shows that the contract was broken by appellee.  As the judgment must be reversed on account of the errors already indicated, we express no opinion upon this question.  Other alleged errors in the rulings of the court upon the admission of testimony are also assigned, but as such errors, if any, will doubtless be corrected upon a new trial, we deem it unnecessary to discuss them here.

The judgment of the Circuit Court will be reversed and the cause remanded.

*Reversed and remanded.*